# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF TEXAS
### MARSHALL DIVISION

|  |  |  |
|---|---|---|
| THOMAS NEMKY, Individually and On Behalf of All Others Similarly Situated, | § § § § | **CIVIL ACTION NO.** |
| Plaintiff, | § § | **CLASS ACTION COMPLAINT** |
| vs. | § § | |
| TRINITY INDUSTRIES, INC., TIMOTHY R. WALLACE, and JAMES E. PERRY, | § § § § | **JURY TRIAL DEMANDED** |
| Defendants. | § § § | |

Plaintiff, Thomas Nemky ("Plaintiff"), alleges the following based upon the investigation of Plaintiff's counsel, which included, among other things, a review of Defendants' public documents, conference calls and announcements, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding Trinity Industries, Inc. ("Trinity" or the "Company"), filings in *United States ex rel. Harman v. Trinity Industries, Inc.*, No. 2:12-cv-00089 (E.D. Tex.) ("*Harman*"), and securities analysts' reports and advisories about the Company.  Plaintiff believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION AND OVERVIEW

1. This is a federal class action on behalf of purchasers of the securities of Trinity, who purchased or otherwise acquired Trinity securities between February 20, 2014 and April 29, 2015, inclusive (the "Class Period"), seeking to pursue remedies under the Securities Exchange Act of 1934 (the "Exchange Act").

2.      Trinity is a diversified industrial company that owns a variety of businesses which provide products and services to the energy, transportation, chemical, and construction sectors. Trinity has five principal business groups:   Rail Group, Railcar Leasing and Management Services Group, Energy Equipment Group, Inland Barge Group, and Construction Products Group.  Within its Construction Products Group, the Company manufactures through its subsidiaries highway products including guardrails, crash cushions, and other protective barriers.

3.      One of the Company's highway products is the ET-Plus system, which is manufactured by its subsidiary, Trinity Highway Products, LLC,[1] under license from the Texas A&M Transportation Institute (the "TTI").  According to Trinity's website, the ET-Plus is "a competitively priced, energy absorbing guardrail end treatment."[2]  The ET-Plus system is installed on highways across the nation.

4.      On January 23, 2013, a *qui tam* whistleblower action (the "Whistleblower Action") filed in this District and alleging claims against the Company under 31 U.S.C. § 3729 *et seq*. (the "False Claims Act") for defrauding the United States government was unsealed and made public.[3]  The Whistleblower Action asserts that Trinity made changes to the ET-Plus system in 2005 that could prevent the ET-Plus from properly functioning and cause the device to impale vehicles in a collision, but that the Company did not inform the Department of Transportation's Federal Highway Administration ("FHWA") of the changes when seeking

---

[1]      For simplicity, Trinity Highway Products, LLC is referred to herein collectively with the Company as "Trinity."

[2]      Trinity   Industries,   Inc.,   *ET-Plus   System   End   Terminal*,   available   at http://www.highwayguardrail.com/products/pdfs/ET-Plus_PISheet.pdf   (last   visited   May   15, 2015).

[3]      *Harman*, ECF No. 1.

approval of the modified ET-Plus system.  The FHWA is tasked with approving highway products so that states may receive reimbursement from the federal government when purchasing such products for use on roads.

5.      In response to the Whistleblower Action, the Company misleadingly assured investors throughout the Class Period that the ET-Plus system had always "satisfied [all crash] testing criteria…and product approval requirements."

6.      As detailed herein, investors first began to learn in October 2014 that the claims of the Whistleblower Action were meritorious.

7.      First, on October 12, 2014, *The New York Times* reported that at least three states—including Massachusetts, Missouri, and Nevada—were refusing to install the ET-Plus system due to concerns that the product was unsafe and prone to a malfunction that could cause highway guardrails to impale cars on impact.[4]  That article also questioned the relationship between Trinity and the FHWA, noting that certain FHWA officials had previously called into doubt the safety of the ET-Plus system despite ultimately supporting the product only after meeting with representatives from Trinity.  On this news, the price of Company stock declined $2.07 per share, or nearly 6% over a single trading day, from a close of $35.17 per share on October 10, 2014, to close at $33.10 per share on October 13, 2014 on heavy trading volume.

8.      Two days later, on October 14, 2014, *The New York Times* reported that officials in Virginia were threatening to stop purchasing the ET-Plus system and would remove all ET-Plus systems installed on Virginia roads if the Company did not conduct additional crash tests on

---

[4]      Danielle Ivory and Aaron Kessler, *Highway Guardrail May be Deadly, States Say*, THE NEW YORK TIMES, Oct. 12, 2014.

the product in the presence of Virginia officials. [5]   On this news, the price of Trinity stock declined $0.53 per share, or approximately 1.5%, from a close of $33.68 per share on October 14, 2014, to close at $33.15 per share on October 15, 2014 on heavy trading volume.

9.      On October 20, 2014, the jury hearing the Whistleblower Action found that Trinity had violated the False Claims Act by concealing changes made to the ET-Plus system in 2005, and further found that the federal government had sustained $175 million in damages as a result of that violation.[6]   Additionally, under the False Claims Act, those damages will be tripled and added to a potential civil penalty.  Following the news of the jury's verdict against Trinity, the price of the Company's stock declined $4.45 per share, or more than 12%, from a close of $36.08 per share on October 17, 2014, to close at $31.63 per share on October 20, 2014 on heavy trading volume.

10.      Soon thereafter, on October 24, 2014, the Company ceased new shipments of the ET-Plus system until it could complete additional crash testing, as requested by the FHWA.[7]   On this news, the price of Trinity stock declined $0.46 per share, or approximately 1.3% over a single day of trading, from a close of $35.54 per share on October 24, 2014, to close at $35.08 per share on October 27, 2014.

---

[5]      Aaron Kessler and Danielle Ivory, *Virginia Threatens to Remove Guardrails Unless Manufacturer Performs New Tests*, THE NEW YORK TIMES, Oct. 14, 2014.

[6]      *Harman*, ECF No. 570.

[7]      Trinity Highways Products, LLC, *Trinity Highway Products to Stop Shipments of ET-Plus System*, Oct. 24, 2014, available at http://www.prnewswire.com/news-releases/trinity-highway-products-to-stop-shipments-of-et-plus-system-814908886.html (last visited May 15, 2015).

11.     On April 22, 2015, *Bloomberg* reported that Trinity's ET-Plus system was the subject of a U.S. Department of Justice ("DOJ") federal criminal probe.[8]  The article further reported that "federal investigators are interviewing potential witnesses about issues including Trinity's relationship with the FHWA," and that "[i]nvestigators from a public corruption and special prosecutions unit of the Justice Department have subpoenaed documents from court battles involving Trinity's ET-Plus on behalf of a grand jury[.]"[9]  On the news of the criminal investigation, the price of Trinity stock declined $3.43 per share, or more than 9%, from a close of $36.25 per share on April 21, 2015, to close at $32.82 per share on April 22, 2015, on heavy trading volume.

12.     On April 24, 2015, Trinity's executives confirmed during a conference call that the DOJ was investigating the Company.  Also on April 24, 2015, Trinity filed its Quarterly Report with the SEC on Form 10-Q, and reported that Company had been named in several class action lawsuits filed by municipalities in both the United States and Canada for its conduct with respect to the ET-Plus system, while at least 41 states had removed the ET-Plus from their qualified products lists.  On this news, shares of the Company's stock declined an additional $4.66 per share, or nearly 14%, from a close of $33.36 per share on April 23, 2015, to close at $28.70 per share on April 24, 2015, on heavy trading volume.

13.     Finally, on April 29, 2015, *Bloomberg* reported that Trinity had received a subpoena from the DOJ "over its allegedly defective guardrail safety system" seeking "documents from 1999 and later regarding Trinity's guardrail end terminals[.]"[10]  On this news,

---

[8]     Patrick G. Lee, *U.S. Opens Criminal Probe Into Highway Guardrails Alleged to Turn Into Spears on Impact*, BLOOMBERG, Apr. 22, 2015.

[9]     *Id.*

[10]    Patrick G. Lee, *Trinity Gets Subpoena in Probe of Guardrail Safety Device*, BLOOMBERG, Apr. 29, 2015.

the price of Trinity stock declined an additional $0.98 per share, or nearly 3.5%, from a close of $28.07 per share on April 29, 2015, to close at $27.09 per share on April 30, 2015, on heavy trading volume.

14.     Throughout the Class Period, Defendants failed to disclose material adverse facts that were likely to negatively impact the Company's financial condition and business prospects. Specifically, Defendants failed to disclose, *inter alia*, that: (1) Trinity had improperly obtained FHWA approval of the modified ET-Plus system in 2005 by, among other things, failing to disclose certain changes it had made to the ET-Plus system and conducting insufficient crash testing on the modified product; (2) Trinity had manipulated the FHWA's approval process for the modified ET-Plus system; and (3) such conduct caused the Company to violate the False Claims Act, exposing it to significant civil liabilities, criminal investigation, and bans of the ET-Plus system.  Thus, Defendants' Class Period statements were false and misleading when made.

15.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class Members suffered damages.

## JURISDICTION AND VENUE

16.     The claims asserted herein arise under and pursuant to Sections 10(b) and 20(a) of the Exchange Act, (15 U.S.C. §§ 78j(b) and 78t(a)), and Rule 10b-5 promulgated thereunder (17 C.F.R. § 240.10b-5).

17.     This Court has jurisdiction over the subject matter of this action pursuant to Section 27 of the Exchange Act (15 U.S.C. § 78aa) and 28 U.S.C. § 1331.

18.     Venue is proper in this District pursuant to Section 27 of the Exchange Act, 15 U.S.C. § 78aa and 28 U.S.C. § 1391(b).  This case is related to *Harman*, which is currently

pending before the Honorable Rodney Gilstrap of the United States District Court for the Eastern District of Texas, Marshall Division.

19.     In connection with the acts, conduct, and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce.

## PARTIES

20.     Plaintiff, Thomas Nemky, as set forth in the accompanying certification incorporated by reference herein, purchased Trinity securities at artificially inflated prices during the Class Period and has been damaged thereby.

21.     Defendant Trinity is a Delaware corporation with its principal executive offices located at 2525 N. Stemmons Freeway, Dallas, Texas.

22.     Defendant Timothy R. Wallace ("Wallace") was, at relevant times, the Company's President, Chief Executive Officer ("CEO"), and Chairman of the Board of Directors.

23.     Defendant James E. Perry ("Perry") was, at relevant times, the Company's Chief Financial Officer ("CFO") and a Senior Vice President.

24.     Defendants Wallace and Perry are collectively referred to hereinafter as the "Individual Defendants."  The Individual Defendants, because of their positions within the Company, possessed the power and authority to control the contents of Trinity's reports to the SEC, press releases, and presentations to securities analysts, money and portfolio managers, and institutional investors, *i.e.*, the market.  Each Individual Defendant was provided with copies of the Company's reports and press releases alleged herein to be misleading prior to, or shortly after, their issuance and had the ability and opportunity to prevent their issuance or cause them to be corrected.  Because of their positions and access to material non-public information available

to them, each of the Individual Defendants knew that the adverse facts specified herein had not been disclosed to, and were being concealed from, the public, and that the positive representations which were being made were materially false and misleading.

## SUBSTANTIVE ALLEGATIONS

### Background and Pre-Class Period Developments

25.     Trinity is a diversified industrial company that owns a variety of businesses which provide products and services to the energy, transportation, chemical, and construction sectors.  Trinity has five principal business groups:   Rail Group, Railcar Leasing and Management Services Group, Energy Equipment Group, Inland Barge Group, and Construction Products Group.

26.     Trinity's Construction Products Group manufactures, among other things, highway products such as guardrails, crash cushions, and other protective barriers.  Trinity sells its highway products throughout the United States, Canada, and Mexico.

27.     Among the highway products manufactured and sold by Trinity's Construction Products Group is the ET-Plus system.   According to Trinity's website, the ET-Plus is "a competitively priced, energy absorbing guardrail end treatment."[11]  The following is an image of the ET-Plus system:[12]

---

[11]     Trinity Highway Products, LLC, *ET-Plus System End Terminal*, available at http://www.highwayguardrail.com/products/pdfs/ET-Plus_PISheet.pdf (last visited May 15, 2015).

[12]     *Id.*



28.     Highway guardrails are designed to minimize the severity of vehicle collisions by slowing vehicles down and preventing them from leaving the road.  However, when a vehicle strikes the end of a guardrail in line with the guardrail's length, it is possible that the guardrail will impale the vehicle and potentially put the driver and passengers at greater risk of injury. Thus, modern guardrails are often equipped with end terminals, such as the ET-Plus system, that are designed to absorb the energy of the impact and deflect the guardrail away from the vehicle. There are multiple types of guardrail end terminals, each with its own method for minimizing harm upon impact.

29.     Guardrail end terminals function by sliding down the guardrail while flattening the guardrail into a ribbon and bending the guardrail away from the vehicle until the vehicle is brought to a stop.  The following image illustrates the result of a collision with a properly functioning system:[13]

---

[13]     John Pearly Huffman, *What Happens If You Crash Into the Pointy End of a Guardrail?*, Car and Driver, January 19, 2015.



30.     States purchasing highway products such as the ET-Plus system are able to receive reimbursement from the federal government for those products, provided that the products have been approved by the FHWA.[14]  Such approval is given to guardrail products if they are deemed "crashworthy."[15]  To be considered crashworthy, the product must meet rigorous guidelines and testing criteria set forth in the Manual for Assessing Safety Hardware ("MASH") or the National Cooperative Highway Research Program Report 350 ("Report 350").[16]  A product need only obtain approval when it is first brought into the market or has been subsequently modified.[17]

---

[14]     U.S. Department of Transportation Federal Highway Administration, *Guardrail Basics*, available at http://www.fhwa.dot.gov/guardrailsafety/guardrailbasics.cfm (last modified Mar. 10, 2015).

[15]     *Id.*

[16]     U.S. Department of Transportation Federal Highway Administration, *Manual for Assessing Safety Hardware (MASH)*, available at http://safety.fhwa.dot.gov/roadway_dept/policy_guide/road_hardware/ctrmeasures/mash/ (last visited May 15, 2015).  In 2011, MASH replaced Report 350 as the standard for measuring

31.     The ET-Plus system was first developed by the Texas A&M Transportation Institute (the "TTI") and approved for federal reimbursement in 2000.[18]   Trinity Highway Products, LLC, which is a Trinity subsidiary, manufactures and markets the ET-Plus system under license from the TTI.[19]

32.     Following certain changes to the ET-Plus system's design, Trinity obtained renewed approval for the modified ET-Plus system in 2005.[20]

33.     On March 6, 2012, a sealed complaint in the Whistleblower Action was filed against Trinity on behalf of the United States under the False Claims Act, alleging that when the ET-Plus system was modified and reapproved in 2005, Trinity failed to disclose to the FHWA that it had narrowed the ET-Plus system's "feeder chute" from five inches to four inches.[21] According to that complaint, the narrowed feeder chute prevents the guardrail from properly feeding through the end terminal, leading to an unsafe condition called a "throat lock" that causes the guard rail to fold over itself or impale the vehicle.[22]   If a guardrail impales a car, the

---

crashworthiness of new products, providing updates to the criteria in response to changes in vehicle design.  *Id.*   Report 350 had been the accepted standard since 1993.  *Id.*

[17]     *See id.*; *see also* National Cooperative Highway Research Program Report 350, available at http://onlinepubs.trb.org/onlinepubs/nchrp/nchrp_rpt_350-a.pdf (last visited May 15, 2015).

[18]     Trinity Highway Products, LLC, *About the ET Plus System*, available at http://www.etplusfacts.com/general-information/about-the-et-plus (last visited May 15, 2015).

[19]     *Id.*

[20]     U.S. Department of Transportation Federal Highway Administration, Letter of Approval of Modified ET-Plus System, Sept. 2, 2005, available at http://www.fhwa.dot.gov/guardrailsafety/cc_0094_fhwa_acceptance_letter20050902.pdf (last visited May 15, 2015).

[21]     *Harman*, ECF No. 1.  The "feeder chute" is the portion of the end terminal through which the guardrail slides during a collision.

[22]     *Id.*

results can be devastating, as reflected in the following images provided in the initial complaint in the Whistleblower Action:[23]



34.     Trinity's failure to inform the FHWA of the modification to the ET-Plus system's feeder chute was, according to the Whistleblower Action, a violation of the False Claims Act and caused the federal government to reimburse states for a product that did not meet the FHWA's approval requirements.[24]  The Whistleblower Action was unsealed on January 23, 2013.[25]

35.     On May 16, 2013, an amended complaint was filed in the Whistleblower Action, expanding on the facts and allegations contained in the initial complaint.[26]  As described in that amended complaint, although the redesigned ET-Plus system "fail[s] at an alarming rate," Trinity did not perform the required additional testing of the redesigned product in 2005 and "fraudulently concealed the series of modifications it made on the ET-Plus" at that time.[27]  Thus, Trinity obtained approval of the redesigned ET-Plus system by deceiving the FHWA.[28]

---

[23]     *Id.* at 6.

[24]     *Id.* at 8-9.

[25]     *Harman*, ECF No. 8.

[26]     *Harman*, ECF No. 22.

[27]     *Id.* at 5, 11.

[28]     *Id.* at 10-12.

36.     On June 19, 2013, Trinity moved to dismiss the amended complaint in the Whistleblower Action.[29]  On January 6, 2014, the court issued an order granting in part and denying in part Trinity's motion, dismissing only the claims that were barred under the False Claims Act's statute of limitations.[30]

### Materially False and Misleading
### Statements Issued During the Class Period

37.     The Class Period begins on February 20, 2014 to coincide with the Company's filing of its 2013 Annual Report with the SEC on Form 10-K, which was signed by the Individual Defendants (among others).  The Form 10-K also contained certifications pursuant to the Sarbanes-Oxley Act of 2002, through which the Individual Defendants certified that the information contained in the Form 10-K "fairly presents, in all material respects, the financial condition and result of operations of the Company."  With respect to the Company's ET-Plus system and the Whistleblower Action, the Form 10-K stated:

> As previously reported, on January 28, 2013, the Company was advised that the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act (Qui Tam) complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division styled JOSHUA HARMAN, on behalf of the UNITED STATES OF AMERICA, PLAINTIFF/Relator ("Mr. Harman") v. TRINITY INDUSTRIES, INC., DEFENDANT, Case 2:12-cv-00089-JRG . . . . Mr. Harman alleges that the Company presented false or fraudulent claims, records or statements to the United States to obtain payment or approval related to the Company's ET-Plus guardrail end-terminal, and seeks damages equaling the cost to recall and replace all installations of the ET-Plus trebled, plus civil penalties, costs, and interest. ***The Company notes that since its introduction in 2000, including all improvement modifications thereafter, the ET-Plus has satisfied the testing criteria required by the governing National Cooperative Highway Research Program Report 350 and the product approval requirements of***

---

[29]     *Harman*, ECF No. 29.

[30]     *Harman*, ECF No. 96.

*the Federal Highway Administration.*   The Company intends to vigorously defend against Mr. Harman's allegations which will likely result in certain legal expenses.   We do not believe that a loss is probable nor can a range of losses be determined. Accordingly, no accrual or range of loss has been included in the accompanying consolidated financial statements.[31]

38.    On April 30, 2014, Trinity filed its Quarterly Report with the SEC on Form 10-Q, which was signed by Defendant Perry.  The Form 10-Q also contained certifications pursuant to the Sarbanes-Oxley Act of 2002, through which the Individual Defendants certified that the information contained in the Form 10-Q "fairly presents, in all material respects, the financial condition and result of operations of the Company."  With respect to the Company's ET-Plus system and the Whistleblower Action, the Form 10-Q repeated the statement set forth in ¶ 37.

39.    The Whistleblower Action began trial on July 14, 2014.[32]  On July 18, 2014, the court declared a mistrial.[33]  When informing the jury of the reasons for the mistrial, the court stated that the litigation had been "replete with errors, gamesmanship, inappropriate conduct, and matters that should not be a part of any trial where a fair and impartial verdict is expected."[34] Among other misconduct, the court highlighted for the jury that "there are serious issues regarding whether or not the president of Trinity Highway Products intentionally attempted to intimidate a witness from appearing in this case, tampered with a witness, or committed perjury."[35]

40.    On July 30, 2014, Trinity filed its Quarterly Report with the SEC on Form 10-Q, which was signed by Defendant Perry.  The Form 10-Q also contained certifications pursuant to

---

[31]    All emphases herein are added unless otherwise stated.

[32]    *Harman*, ECF No. 377.

[33]    *Harman*, ECF No. 381.

[34]    *Harman*, ECF No. 393, at 4.

[35]    *Id.* at 4-5.

the Sarbanes-Oxley Act of 2002, through which the Individual Defendants certified that the information contained in the Form 10-Q "fairly presents, in all material respects, the financial condition and result of operations of the Company."  With respect to the Company's ET-Plus system and the Whistleblower case, the Form 10-Q stated:

> As previously reported, on January 28, 2013, the United States filed a "Notice of Election to Decline Intervention" in a False Claims Act (Qui Tam) complaint filed under seal on March 6, 2012 in the United States District Court for the Eastern District of Texas, Marshall Division styled <u>Joshua Harman, on behalf of the United States of America, Plaintiff/Relator ("Mr. Harman") v. Trinity Industries, Inc., Defendant</u>, Case 2:12-cv-00089-JRG. . . . The trial began on July 14, 2014 and ended in a mistrial on July 18, 2014.  The case is expected to be retried in the fall of 2014.  Mr. Harman alleges the Company knowingly presented or caused to be presented a false or fraudulent claim, record or statement to purchasers of the product in order for such purchasers to obtain payment or approval (eligibility for Federal-aid reimbursement) related to the Company's ET-Plus guardrail end-terminal system. Mr. Harman is seeking damages equaling the amount the United States paid in federal-aid reimbursement for ET-Plus systems from March 6, 2006 to December 31, 2013, less the value of the ET-Plus systems received, trebled, plus civil penalties.  Mr. Harman's most recent damage model calculates this amount at approximately $775.7 million exclusive of attorney's fees, costs, and interest. The Company intends to vigorously defend itself against Mr. Harman's allegations which will result in certain legal expenses.
>
> ***Since its introduction in 2000, including all improvement modifications thereafter, the ET-Plus system has satisfied the testing criteria required by the governing National Cooperative Highway Research Program Report 350 and the product approval requirements of the Federal Highway Administration*** ("FHWA").  As affirmed in a Memorandum dated June 17, 2014, the FHWA advised its Division Administrators, Directors of Field Services, Federal Lands Division Engineers, and Safety Field that "The Trinity ET-Plus with 4-inch guide channels became eligible for Federal reimbursement under FHWA letter CC-94 on September 2, 2005.  In addition, the device is eligible for reimbursement under FHWA letters CC-94A and CC-120.  Staff confirmed the reimbursement eligibility of the device at heights from 27 3/4 inches to 31 inches.  An unbroken chain of eligibility for Federal-aid reimbursement has existed since September 2, 2005

and the ET-Plus continues to be eligible today."   This Memorandum is available on the FHWA's web site at:

http://safety.fhwa.dot.gov/roadway_dept/policy_guide/road_hardw are/memo_etplus_wbeam.cfm

Based upon the unbroken chain of eligibility of the ET-Plus system for Federal-aid reimbursement, we do not believe that a loss is probable or that a range of reasonably possible losses exists. Accordingly, no accrual or range of loss has been included in the accompanying consolidated financial statements.

41.     Defendants' statements contained in ¶¶ 37 – 38, 40 were materially false and misleading when made because Defendants failed to disclose, *inter alia*, that: (1) Trinity had improperly obtained FHWA approval of the modified ET-Plus system in 2005 by, among other things, failing to disclose certain changes it had made to the ET-Plus system and conducting insufficient crash testing on the modified product; (2) Trinity had manipulated the FHWA's approval process for the modified ET-Plus system; and (3) such conduct caused the Company to violate the False Claims Act, exposing it to significant civil liabilities, criminal investigation, and bans of the ET-Plus system.   As a result of the foregoing, Defendants' Class Period statements were false and misleading when made.

**The Truth Begins to Emerge**

42.     On October 12, 2014, *The New York Times* published an article entitled "Highway Guardrail May Be Deadly, States Say."  The article stated, in relevant part:

By last month, state transportation officials in Missouri said they had seen enough.

Federal highway officials had long insisted that guardrails throughout the state were safe. But some guardrail heads had apparently malfunctioned, in essence turning the rails into spears when cars hit them and injuring people instead of cushioning the blow, Missouri officials said.

"The device is not always performing as it is designed and intended," a Missouri transportation official wrote of the problematic rail heads in an internal communication.

Because of its safety concerns, **Missouri banned further installation of the rail heads on Sept. 24.  It joined Nevada, which prohibited further purchases in January, and was followed six days later by Massachusetts.  Lawsuits say the guardrails were to blame for five deaths, and many more injuries, in at least 14 accidents nationwide.**

\*      \*      \*

**[I]nternal communications and documents from the [FHWA] show that a senior engineer charged with examining the guardrails expressed reservations about their safety, before he signed off on their continued use about two years ago**.

At one point, agency officials drafted a letter asking the manufacturer to conduct additional testing, but the letter was never sent, according to interviews and a review of the documents by The New York Times.

"There does seem to be a valid question over the field performance," the senior engineer, Nicholas Artimovich, wrote in an email to his colleagues in February 2012, after an agency engineer based in South Carolina raised questions about the guardrails.

In a separate email to an outside safety expert a month later, Mr. Artimovich wrote that it was **"hard to ignore the fatal results."**

\*      \*      \*

[Q]uestions are being raised about the close ties between federal safety agencies and the companies they are charged with overseeing.  The internal communications at the Federal Highway Administration show that **Mr. Artimovich endorsed the Trinity guardrails after meeting privately with company officials and being assured the tests were adequate**.

But some were skeptical.  "Scary to think the system is no longer working as it was originally designed," a Connecticut engineer wrote to Mr. Artimovich, adding in a separate email that she was "leery of the product."

The Connecticut engineer asked if she should put a moratorium on new installations until the issue was resolved.  "These are

questions we are looking into also," Mr. Artimovich replied in an
email on March 14, 2012. [36]

43.     On this news, the price of Company stock declined $2.07 per share, or nearly 6%
over a single trading day, from a close of $35.17 per share on October 10, 2014, to close at
$33.10 per share on October 13, 2014 on heavy trading volume.

44.     The retrial of the Whistleblower case commenced on October 13, 2014.[37]

45.     On October 14, 2014, after the close of trading, *The New York Times* published an
article entitled "Virginia Threatens to Remove Guardrails Unless Manufacturer Performs New
Tests."  The article states, in relevant part:

> Concern is mounting over the safety of guardrails sold by Trinity
> Industries, as yet another state has threatened to stop buying them,
> and will consider removing them.
>
> Virginia, in a letter sent to the company on Friday, told Trinity that
> ***state transportation officials did not believe Trinity had properly
> tested the end of a guardrail it redesigned in 2005.***  Virginia
> officials also told Trinity, which is based in Dallas, that ***the
> company had made changes to the design without telling them.***
>
> ***If the company does not conduct new tests, in the presence of
> Virginia officials***, and provide proof to the state's Transportation
> Department by Oct. 24, ***the state will ban the product***, officials
> said.
>
> "We've given them a deadline to provide the research we're asking
> for," said Marshall Herman, a department spokeswoman.  "If they
> can't prove to us it's safe for use on Virginia roads, then we're not
> going to use it, and we'll begin to inventory where the product is
> installed and look into removing them."
>
>                              *         *         *
>
> Virginia raised questions with Trinity about the guardrail in May,
> when it requested additional crash test documentation and

---

[36]     Danielle Ivory and Aaron M. Kessler, *Highway Guardrail May Be Deadly, States Say*,
THE NEW YORK TIMES, Oct. 12, 2014.

[37]     *Harman*, ECF No. 553.

diagrams about the ET-Plus.  ***The state's finding stands in contrast to that of the Federal Highway Administration***, which has said that it had examined results of the crash tests in 2012 and deemed the guardrails eligible for federal-aid reimbursement.  The New York Times reported on Monday that federal highway officials had expressed doubts about the guardrails before they offered public assurances.

*       *       *

Ms. Herman, the Virginia Transportation Department spokeswoman, said the state planned to make its own safety determination, regardless of any federal assurances.

 "***Even if a product may be on the federal approved list, that doesn't mean we'd want it on ours***," she said.[38]

46.      On this news, the price of Trinity stock declined $0.53 per share, or approximately 1.5%, from a close of $33.68 per share on October 14, 2014, to close at $33.15 per share on October 15, 2014 on heavy trading volume.

47.      On October 20, 2014, the jury in the Whistleblower Action found "that Defendant Trinity Industries, Inc. knowingly made, used, or caused to be made or used, a false record or statements material to a false or fraudulent claim."[39]  The jury also found that the federal government had sustained $175 million in damages as a result of Trinity's violation, which would be trebled (for total liability of $525 million) and added to any civil penalty imposed by the court pursuant to the False Claims Act.[40]

48.      Following the news of the jury's verdict against Trinity, the price of the Company's common stock declined $4.45 per share, or more than 12% over a single day of

---

[38]      Aaron M. Kessler and Danielle Ivory, *Virginia Threatens to Remove Guardrails Unless Manufacturer Performs New Tests*, THE NEW YORK TIMES, Oct. 14, 2014.

[39]      *Harman*, ECF No. 570.

[40]      *Id.*

trading, from a close of $36.08 per share on October 17, 2014, to close at $31.63 per share on October 20, 2014 on heavy trading volume.

49.     Four days later, on October 24, 2014, the Company issued a press release announcing that it would "stop the shipment of the ET-Plus® System until additional crash testing can be completed."[41]  The press release explained that the FHWA had "recently requested additional crash testing of the ET-Plus® System in support of its ongoing evaluation of the ET-Plus® System."[42]  By that date, at least 13 states had banned the ET-Plus system.[43]

50.     On this news, the price of Trinity stock declined $0.46 per share, or approximately 1.3% over a single day of trading, from a close of $35.54 per share on October 24, 2014, to close at $35.08 per share on October 27, 2014.

51.     The FHWA announced the final results of the additional ET-Plus system tests on March 13, 2015, stating that the ET-Plus had met the applicable crash test criteria.[44]  Critics quickly denounced the results, with United States Senator Richard Blumenthal stating that the FHWA had "given the ET-Plus a passing grade after allowing the manufacturer to conduct sham

---

[41]     Trinity Highway Products, LLC, *Trinity Highway Products to Stop Shipments of ET-Plus System*, October 24, 2014, available at http://www.prnewswire.com/news-releases/trinity-highway-products-to-stop-shipments-of-et-plus-system-814908886.html (last visited May 15, 2015).

[42]     *Id.*

[43]     *See* Danielle Ivory and Aaron Kessler, *Producer of Highway Guardrails to Halt Sales*, THE NEW YORK TIMES, Oct. 24, 2014.  By the end of October 2014, more than 30 states had banned the ET-Plus.  *See* Danielle Ivory and Aaron Kessler, *Trinity Guardrail Installation Now Banned in More Than 30 States*, THE NEW YORK TIMES, Oct. 31, 2014.

[44]     U.S. Department of Transportation Federal Highway Administration, *FHWA Releases Results and Analysis of the Second Set of Crash Tests of ET-Plus Guardrail End Terminals*, Mar. 13, 2015, available at http://www.fhwa.dot.gov/pressroom/fhwa1518.cfm (last visited May 15, 2015).

tests rife with flaws."[45]  Senator Blumenthal explained that he believed the FHWA had used

outdated, less rigorous testing standards.[46]  Similarly, a spokesperson for Virginia's Department

of Transportation said that Virginia was still refusing to install Trinity's products and "would

review all data from the eight crash tests before making its own determination of the results."[47]

52.    Senator Blumenthal revived his criticism of the FHWA's conclusion that the ET-

Plus system was safe on March 23, 2015, when he urged the United States Department of

Transportation to review that conclusion.[48]  In his press release issued that day, which contained

the text of a letter Senator Blumenthal had sent to the Department of Transportation, Senator

Blumenthal stated:

> The FHWA's effort several days ago to deem these devices as safe
> appears to be ***the agency's latest attempt to absolve itself for years
> of inaction***.  I urge [the Department of Transportation] to take over
> this matter so the public can finally know if these products can kill
> and maim motorists as so many claim. . . .  We need to know
> whether ET-Plus devices – like any federally approved and
> underwritten roadside hardware – are safe.  ***The FHWA has failed
> in this mission, focusing more on minimizing its own failings
> and, unconvincingly, continuing to stand by the devices and the
> manufacturer***.[49]

53.    In that press release, Senator Blumenthal also questioned the logic of allowing

Trinity to test the ET-Plus system in 2005 in a facility run by TTI—which designed and has an

---

[45]    Aaron Kessler and Danielle Ivory, *Guardrails Said to Pass Safety Tests*, THE NEW YORK
TIMES, Mar. 13, 2015.

[46]    *Id.*

[47]    *Id.*

[48]    *See* Office of Senator Richard Blumenthal, *Blumenthal Urges DOT to Review Guardrail
Ruling after Controversial, Flawed Testing*, Mar. 23, 2015, available at
http://www.blumenthal.senate.gov/newsroom/press/release/blumenthal-urges-dot-to-review-
guardrail-ruling-after-controversial-flawed-testing (last visited May 15, 2015).

[49]    *Id.*

ownership interest in the ET-Plus system.[50]  Moreover, Senator Blumenthal expressed concerns

that the 2015 testing included "many newer, recently modified [ET-Plus] versions [that were]

more likely to pass" and "failed to evaluate how the devices have performed in real world

scenarios."[51]

54.    On April 22, 2015, *Bloomberg* reported that the DOJ had initiated a federal

criminal probe regarding Trinity's ET-Plus system.  The article stated, in relevant part:

> The U.S. Justice Department is conducting ***a criminal investigation into the use of a highway guardrail system linked to at least eight deaths***, according to people familiar with the matter, signaling a new wave of potential woes for manufacturer Trinity Industries Inc.
>
> Word of the inquiry comes weeks after Trinity appeared poised to move on from more than a year of scrutiny in courts and from states over the performance of its embattled ET-Plus, a product meant to blunt the impact of cars that crash headlong into guardrails.  In March, Trinity's system passed a closely watched series of crash tests ordered by the Federal Highway Administration, the government agency that certifies the safety of roadside hardware.
>
> Now, ***federal investigators are interviewing potential witnesses about issues including Trinity's relationship with the FHWA***, according to these people. Investigators from a public corruption and special prosecutions unit of the Justice Department have subpoenaed documents from court battles involving Trinity's ET-Plus on behalf of a grand jury, according to one of these people.
>
> *          *          *
>
> The investigation indicates that ***the most serious turn in Trinity's guardrail saga may be yet to come***, adding the specter of criminal wrongdoing to previous allegations of fraud and deadly design changes.[52]

---

[50]    *See id.*

[51]    *Id.*

[52]    Patrick G. Lee, *U.S. Opens Criminal Probe Into Highway Guardrails Alleged to Turn Into Spears on Impact*, BLOOMBERG, Apr. 22, 2015.

55.     On the news of the criminal investigation, the price of Trinity stock declined $3.43 per share, or more than 9%, from a close of $36.25 per share on April 21, 2015, to close at $32.82 per share on April 22, 2015, on heavy trading volume.

56.     On April 24, 2015, Trinity's executives confirmed during an investor conference call that the DOJ was investigating the Company.  Also on that date, Trinity filed its Quarterly Report with the SEC on Form 10-Q, and reported that the Company had been named in multiple class action lawsuits filed by municipalities and counties in Illinois, Wisconsin, and Ontario, Canada, for its conduct with respect to the ET-Plus system.  That Quarterly Report also noted that Virginia had joined in a *qui tam* action against the Company, alleging the same claims as those in the Whistleblower Action.  Moreover, the Company disclosed that it was "aware of 41 states that have removed the ET Plus from their respective qualified products list."

57.     On this news, the price of the Company's stock declined an additional $4.66 per share, or nearly 14%, from a close of $33.36 per share on April 23, 2015, to close at $28.70 per share on April 24, 2015, on heavy trading volume.

58.     Finally, on April 29, 2015, *Bloomberg* reported that Trinity had received a subpoena from the DOJ on April 28, 2015 regarding "its allegedly defective guardrail safety system," seeking documents from as early as 1999.[53]  On this news, the price of Trinity stock declined an additional $0.98 per share, or nearly 3.5%, from a close of $28.07 per share on April 29, 2015, to close at $27.09 per share on April 30, 2015, on heavy trading volume.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

59.     Plaintiff brings this action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of all persons who purchased Trinity securities during the

---

[53]     Patrick G. Lee, *Trinity Gets Subpoena in Probe of Guardrail Safety Device*, BLOOMBERG, April 29, 2015.

Class Period (the "Class").  Excluded from the Class are Defendants, directors and officers of Trinity, and their families and affiliates.

60.     The members of the Class are so numerous that joinder of all members is impracticable.  The disposition of their claims in a class action will provide substantial benefits to the parties and the Court.  According to the Company's Form 10-K filed with the SEC on February 19, 2015, Trinity had more than 155 million shares of stock outstanding, owned by thousands of persons.

61.     There is a well-defined community of interest in the questions of law and fact involved in this case.  Questions of law and fact common to the members of the Class which predominate over questions which may affect individual Class members include:

a.     Whether Defendants violated the Securities Exchange Act;

b.     Whether Defendants omitted and/or misrepresented material facts;

c.     Whether Defendants' statements omitted material facts necessary in order to make the statements not misleading;

d.     Whether Defendants knew or recklessly disregarded that their statements were false and misleading;

e.     Whether the prices of Trinity securities were artificially inflated; and

f.     The extent of damage sustained by Class members and the appropriate measure of damages.

62.     Plaintiff's claims are typical of those of the Class because Plaintiff and the Class sustained damages from Defendants' wrongful conduct.

63.     Plaintiff will adequately protect the interests of the Class and has retained counsel who are experienced in class action securities litigation.  Plaintiff has no interests which conflict with those of the Class.

64.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.

## LOSS CAUSATION/ECONOMIC LOSS

65.     Defendants' wrongful conduct, as alleged herein, directly and proximately caused the economic loss suffered by Plaintiff and the Class.   The price of Trinity's securities significantly declined when the misrepresentations made to the market, and/or the information alleged herein to have been concealed from the market, and/or the effects thereof, were revealed, causing investors' losses.  As a result of their purchases of Trinity securities during the Class Period, Plaintiff and other members of the Class suffered economic loss, *i.e.*, damages, under the federal securities laws.

## SCIENTER ALLEGATIONS

66.     During the Class Period, Defendants had both the motive and opportunity to commit fraud.  They also had actual knowledge of the misleading nature of the statements they made or acted in reckless disregard of the true information known to them at the time.  In so doing, Defendants participated in a scheme to defraud and participated in a course of business that operated as a fraud or deceit on purchasers of Trinity's securities during the Class Period.

## APPLICABILITY OF PRESUMPTION OF RELIANCE:
## FRAUD ON THE MARKET DOCTRINE

67.     Plaintiff will rely upon the presumption of reliance established by the fraud-on-the-market doctrine in that, among other things:

a.     Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

b.     The omissions and misrepresentations were material;

c.     The Company's securities traded on an efficient market;

d.     The misrepresentations alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; and

e.     Plaintiff and other members of the Class purchased Trinity securities between the time Defendants misrepresented or failed to disclose material facts and the time the true facts were disclosed, without knowledge of the misrepresented or omitted facts.

68.     At all relevant times, the market for Trinity securities was efficient for the following reasons, among others: (a) as a regulated issuer, Trinity filed periodic public reports with the SEC; and (b) Trinity regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the major news wire services and through other wide-ranging public disclosures, such as communications with the financial press, securities analysts, and other similar reporting services.

## NO SAFE HARBOR

69.     Defendants' "Safe Harbor" warnings accompanying their forward-looking statements ("FLS") issued during the Class Period were ineffective to shield those statements from liability.

70.     Defendants are also liable for any false or misleading FLS alleged herein because, at the time each FLS was made, the speaker knew the FLS was false or misleading.  None of the historic or present tense statements made by Defendants were assumptions underlying or relating

to any plan, projection, or statement of future economic performance, as they were not stated to be such assumptions underlying or relating to any projection or statement of future economic performance when made, nor were any of the projections or forecasts made by Defendants expressly related to or stated to be dependent on those historic or present tense statements when made.

**FIRST CLAIM**
**Violation of Section 10(b) of The Exchange Act and Rule 10b-5**
**Promulgated Thereunder Against All Defendants**

71.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

72.     During the Class Period, Trinity and the Individual Defendants carried out a plan, scheme, and course of conduct which was intended to and, throughout the Class Period, did: (i) knowingly or recklessly make false and misleading statements with respect to the Company; (ii) cause Plaintiff and other members of the Class to purchase Trinity securities at artificially inflated prices; and (iii) ultimately cause Plaintiff and other members of the Class to suffer losses when the truth was revealed to the market.  In furtherance of this unlawful scheme, plan, and course of conduct, Defendants took the actions set forth herein.

73.     Trinity and the Individual Defendants: (i) employed devices, schemes, and artifices to defraud; (ii) knowingly or recklessly made untrue statements of material fact and/or omitted to state material facts necessary to make the statements not misleading; and (iii) engaged in acts, practices, and a course of business which operated as a fraud and deceit upon the purchasers of the Company's securities in an effort to maintain artificially high market prices for Trinity securities in violation of Section 10(b) of the Exchange Act and Rule 10b-5.  Defendants

are sued either as primary participants in the wrongful and illegal conduct charged herein or as controlling persons.

**SECOND CLAIM**
**Violation of Section 20(a) of**
**The Exchange Act Against the Individual Defendants**

74.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

75.     The Individual Defendants acted as control persons of Trinity within the meaning of Section 20(a) of the Exchange Act as alleged herein.  By virtue of their high-level positions, and their ownership and contractual rights, participation in and/or awareness of the Company's operations and/or intimate knowledge of the false financial statements filed by the Company with the SEC and disseminated to the investing public, the Individual Defendants had the power to influence and control and did influence and control, directly or indirectly, the decision-making of the Company, including the content and dissemination of the various false and misleading statements alleged herein.  The Individual Defendants were provided with or had access to copies of the Company's reports, press releases, public filings, and other statements alleged by Plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause the statements to be corrected.

76.     In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company and therefore are presumed to have had the power to control or influence the particular transactions giving rise to the securities violations as alleged herein, and exercised the same.

77.     As set forth above, Trinity and the Individual Defendants each violated Section 10(b) and Rule 10b-5 by their acts and omissions as alleged in this Complaint.  By virtue of their

positions as controlling persons, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act.  As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and other members of the Class suffered damages in connection with their purchases of the Company's securities during the Class Period.

        **WHEREFORE**, Plaintiff prays for relief and judgment, as follows:

      a.      Determining that this action is a proper class action under Rule 23 of the Federal Rules of Civil Procedure;

      b.      Awarding compensatory damages and equitable relief in favor of Plaintiff and the other Class members against all Defendants, jointly and severally, for all damages sustained as a result of Defendants' wrongdoing, in an amount to be proven at trial, including interest thereon;

      c.      Awarding Plaintiff and the Class their reasonable costs and expenses incurred in this action, including counsel fees and expert fees; and

      d.      Such other and further relief as the Court may deem just and proper.

## JURY TRIAL DEMANDED

Plaintiff hereby demands a trial by jury.


Dated: May 15, 2015                       Respectfully submitted,

                                      /s/ *George L. McWilliams*
                                      George L. McWilliams
                                      Texas Bar No. 13877000
                                      **LAW OFFICES OF GEORGE L. McWILLIAMS, P.C.**
                                      P.O. Box 58
                                      Texarkana, Texas-Arkansas 75504
                                      (870) 772-2055
                                      (870) 772-0513 (fax)
                                      Email: glmlawoffice@gmail.com

**KESSLER TOPAZ**
**MELTZER & CHECK, LLP**
Naumon A. Amjed
Darren J. Check
Ryan T. Degnan
Andrew N. Dodemaide
280 King of Prussia Road
Radnor, PA 19087
(610) 667-7706
(610) 667-7056 (fax)
Email: namjed@ktmc.com
Email: dcheck@ktmc.com
Email: rdegnan@ktmc.com
Email: adodemaide@ktmc.com

*Attorneys for Plaintiff*

**KEIL & GOODSON P.A.**
Matt Keil
John C. Goodson
406 Walnut Street
Texarkana, Arkansas 71854
(870) 772-4113
(870) 773-2967 (fax)
Email: mkeil@kglawfirm.com
Email: jcgoodson@kglawfirm.com

*Additional Counsel for Plaintiff*

## CERTIFICATION

I, Thomas C. Nemky, ("Plaintiff"), declare that:

1.      Plaintiff has reviewed the complaint.

2.      Plaintiff did not purchase and/or acquire the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action under the federal securities laws.

3.      Plaintiff is willing to serve as a representative party on behalf of the class, including providing testimony at deposition and trial, if necessary.  I understand that this is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Certification.

4.      Plaintiff's Class Period purchase and sale transaction(s) in **Trinity Industries, Inc.** securities that are the subject of this action are attached in Schedule A.  I have complete authority to bring a suit to recover for investment losses for all securities set forth in Schedule A.

5.      During the three years prior to the date of this Certification, I have not sought to serve or served as a representative party for a class in an action filed under the federal securities laws except as described below:_____.

6.      I will not accept any payment for serving as a representative party on behalf of the class beyond my pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the Court.

Plaintiff declares under penalty of perjury that the foregoing is true and correct.

Executed this _____1_____ day of May, 2015.


_____
THOMAS C. NEMKY

**SCHEDULE A**

| Security | Buy/Sell | Date | Quantity | Price |
|---|---|---|---|---|
| TRN | Buy | 9/10/2014 | 300 | $47.01 |
| TRN | Buy | 10/1/2014 | 200 | $45.03 |
| TRN | Buy | 10/7/2014 | 100 | $39.39 |